## NATIONAL SURETY COMPANY *v.* STATE OF INDIANA, EX REL. RATHBURN.

[No. 12,813.   Filed March 30, 1928.   Rehearing denied June 28, 1928. Transfer denied December 20, 1929.]

*Moses B. Lairy, Frederick VanNuys, Edward E. Gates, George M. Barnard, Julian C. Ralston* and *Raymond L. Walker,* for appellant.

*Donald Fraser, William H. Isham, William S. Isham, Charles H. Stuart, Allison E. Stuart* and *Dan W. Simms,* for appellee.

McMahan, J.—This is an action by appellee as receiver of the Discount and Deposit State Bank of Kentland against Amos D. Morris, as principal and the National Surety Company, as surety, to recover for a breach of the official bond of Morris as cashier of the bank. The cause was tried by the court. The court found the facts specially and stated its conclusions thereon, and judgment was rendered against both defendants for the full penalty of the bond, with interest because of delay. The amount of the judgment is $5,493.33.

The bank was organized under the laws of this state and did a general banking business. Appellant was the surety on the bond of Morris as cashier. The bond was executed January 16, 1917, for the period of one year, was renewed yearly, and was in full force during all the time covered by the finding of facts. The bond was given to secure the bank against such pecuniary loss as might be sustained through the failure of Morris to "honestly and faithfully" discharge his duties as cashier. The bond contains a number of conditions tending to limit and guard the liability of the surety, requiring the

employer to give a certain notice by registered letter of any loss within 20 days after discovery of loss, requiring discovery of loss and filing of suit within six months after expiration of bond, and within six months of death, dismissal, or retirement of the employee, requiring itemized and verified statement of loss showing in detail the items of loss, showing amount of loss, dates of same, if known, date of discovery, etc. The 12th condition of the bond provides: "That the surety shall not be liable for any error of judgment or injudicious exercise of discretion on the part of the employee or for any loss which may be sustained by the employer by reason of any act done or left undone by following the customary course of business or usage of the employer, or in obedience to the direction, instruction, or authorization of the president, vice president, or other officer of the employer, or board of directors."

Warren T. McCray was president of the bank from December, 1915, to August 24, 1923, and, although he moved to Indianapolis with his family in January, 1921, he was a member of the board of directors of the bank and chairman of the committee of loans and discounts. During the time McCray was president and Morris cashier, the bank had in force a by-law providing that no officer or director should obtain any money from the bank upon his note without first procuring the written approval of at least three directors of the bank. In December, 1917, at a meeting when McCray and Morris were present, the board of directors adopted and spread of record a resolution which provided that the bank should not discount notes or bills of exchange for any one person or firm in excess of 20 per cent of the capital and surplus of the bank; that rediscounts for any one person or firm should not exceed 50 per cent of the capital of the bank. The capital of the bank was $70,000, and the surplus did not exceed $30,000. In

July, 1922, McCray tendered to Morris for discount a note for $15,000, purporting to have been executed by the "Orchard Lake Stock Farm," which was a trade name adopted by McCray. This note was in fact the note of McCray. Morris at that time knew there was no such firm or corporation and knew that the note so tendered for discount was the note of McCray. Morris accepted such note, discounted the same, and placed the proceeds thereof in the checking account of McCray. Another note for $15,000, purporting to be the note of a named realty company, was tendered to Morris for discount in July, 1922. This note was also the direct obligation of McCray, as Morris knew. It was also discounted by Morris and the proceeds thereof placed in McCray's checking account. The indorsement and the discounting of said notes was not approved by three directors. At that time, McCray was indebted to the bank in the sum of $180,000 which Morris well knew. Another note of McCray, in the sum of $10,000, was discounted by Morris under like circumstances. When said notes were discounted, McCray was insolvent and continued to be insolvent up to May, 1924, when he was adjudged a bankrupt and later discharged. These notes were at all times valueless and nothing has ever been paid on them. The total of said notes, plus interest, has been lost to the bank. Morris later reported all loans by serial number to the board of directors at their meetings, and the same were approved. McCray was reputed to be a man of great wealth and a man of good standing in the community, and the board of directors believed him to be solvent.

When Morris discounted and loaned the money of the bank to McCray, he knew that all of McCray's real estate was encumbered; that McCray had spent large sums of money in making political campaigns; that McCray had been heavily indebted to the bank for

many years; that this indebtedness had gradually increased; that he had made many efforts to refinance his business and to secure money with which to reduce his excessive loans from the bank; that he was greatly pressed by his financial obligations and was trying to borrow money in large sums from different sources for the purpose of reducing his excessive loans in the bank. When Morris discounted the McCray notes and made the loans, he also knew that all of McCray's efforts to secure money elsewhere to reduce his indebtedness had failed.

The complaint in this action was not filed until more than six months after the bank discovered and knew of the losses because of said McCray notes. No notice of such losses was given the surety company prior to the filing of the complaint in this action. While Morris knew McCray was in financial trouble and had been trying to borrow money from other sources for the purpose of reducing his excessive loans in the bank, he believed McCray was solvent, that each of said notes was good, and he did not have any intention or purpose to wrong or defraud the bank.

The court concluded as a matter of law that: (1) The law was with the plaintiff; (2) that the bond was valid; (3) that the conditions and limitations in the bond were unlawful and void; (4) that there had been a breach in the bond in that Morris had not faithfully discharged his duties, and that, by reason thereof, the bank had lost $40,000; and (5) that the receiver should recover the full penalty named in the bond, $5,000, plus interest from October, 1924, to date of judgment.

Appellant contends the court erred in the first, third and fourth conclusions of law.

In support of the contention that the court erred in the first and fourth conclusions of law, appellant says the bond sued on was given to indemnify the bank from

loss resulting from the failure of Morris to discharge his duties as cashier in an honest and faithful manner, and that it was not intended to cover losses on loans made in good faith by the cashier with the approval of the directors of the bank to a person, who, at the time the loans were made, was a man of integrity, the owner of large and valuable property, and who was believed to be solvent and able to pay his debts in full. In other words, it is appellant's contention that the money was lost to the bank, not because of any dishonesty or infidelity on the part of Morris, but because of a failure on his part to exercise sufficient judgment and discretion in making the loans, and that the fact that the loans were made without the indorsed approval of three other members of the board of directors, as required by the rules of the bank, and in violation of the resolution prohibiting the discounting of notes for any one person in excess of 20 per cent of the capital stock and surplus of the bank, and prohibiting the rediscounting of notes for any one person in excess of 50 per cent of the capital stock of the bank, does not amount to a breach of the bond.

Appellee insists that Morris, in making the excessive loans in violation of the by-law and resolution to one whom he knew was in financial distress, and who at the time was owing the bank $180,000, and who for years had been unable to reduce such indebtedness, was not honestly and faithfully discharging his duties as cashier. In this connection, appellant says there is no finding that Morris did not act honestly and faithfully; that the finding that Morris believed McCray was solvent and that the notes were good, and that Morris did not have any intention or purpose to wrong or defraud the bank in discounting the notes in question is an express negation of any dishonesty or bad faith on the part of Morris.

Section 3854 Burns 1926, Acts 1911 p. 7, requires a cashier of a bank of discount and deposit to take an oath to "faithfully and honestly discharge his duties," and the directors are required to exact a bond from him conditioned that he will "honestly and faithfully" discharge the duties of his office. This bond is for the benefit of the stockholders and creditors of the bank. It is an official bond. *United States Fidelity, etc., Co.* v. *Poetker* (1913), 180 Ind. 255, 102 N. E. 372, L. R. A. 1917B 984.

In a statute requiring the giving of a bond by an officer "for the faithful discharge" of his duties, the words "faithful discharge" were held to mean that such officer must, "with exactness and according to law, perform his official duties; and if he does an act under color of his office, and as an officer, so inaccurately and imperfectly as to occasion a loss to a party to the proceeding, this is a breach of the condition of his bond." *Governor, etc.,* v. *Wiley* (1848), 14 Ala. 172.

"It is an error to suppose that an agreement to perform the duties of the office faithfully, means merely that the incumbent will not wilfully do any wrong act. It has a stretch beyond this, and is broken by a neglect or by carelessness in discharge of the official duties, as well as by an intentional misfeasance." *Mayor, etc.,* v. *Evans* (1865), 31 N. J. Law 342.

A bond for the "faithful" performance of the duties of a teller of a bank is a security for competent skill and ordinary diligence, as well as for integrity in the discharge of the office. *American Bank, etc.,* v. *Adams* (1832), 12 Pick. (29 Mass.) 303.

As was said in *Commonwealth* v. *Wood* (1903), 116 Ky. 748, 76 S. W. 842: "If the act is done with a corrupt purpose, or from a corrupt motive, or with a knowledge by the officer at the time that his official act

is a violation of the law, or if the act is done so negligently or carelessly or recklessly as to show an utter want of care or of concern, and such an act would be tantamount to a fraud, and therefore could be said to be fraudulently done, his act will be a malfeasance, but not otherwise."

"Malfeasance is the unjust performance of some act which the party had no right, or which he had contracted not, to do." *Dudley* v. *City of Flemingsburg* (1903), 115 Ky. 5, 9, 72 S. W. 327, 60 L. R. A. 575, 103 Am. St. 253, 1 Ann. Cas. 958.

In *American Bank, etc.,* v. *Adams, supra,* it was held that a bond for "faithful" performance of duty bound the obligors to a responsibility for reasonable and competent skill and due and ordinary diligence, and not for honesty only, but for a faithful execution of the duties of the office which embraced skill and due diligence.

A bond given by a constable for the "faithful performance" of his duties was held to "embrace all those instances of malfeasance, misfeasance and nonfeasance, in the execution of his office, which would subject a principal to responsibility for similar wrongful acts of his deputy." *Archer* v. *Noble* (1825), 3 Greenl. (Me.) 418.

The rule for the interpretation of bonds seems to be that, when a public officer gives a bond for the faithful discharge of his duties, the word "faithful" is held to imply that he has assumed that measure of responsibility laid on him by law, had no bond been given; that the object of a bond so conditioned is to get sureties for the performance of the duties of the office according to law, and that everything is unfaithfulness which the law does not excuse. *State* v. *Chadwick* (1881), 10 Ore. 465.

"Honesty," when used in money transactions, means

financial integrity. *State* v. *Snover* (1899), 63 N. J. Law 382, 43 Atl. 1059.

Section 2481 Burns 1926, makes it a crime for a president, director, cashier, officer or employee of a bank to obtain, as a borrower, any of the funds of a bank, without executing his note or some other evidence of debt therefor, bearing the written consent of the board of directors. McCray was president of the bank when each of the three notes was presented by him to Morris and when they were discounted. None of these notes bore the consent of the directors. The money obtained thereon was obtained in violation of the statute. It was also obtained in violation of the by-law and resolution of the bank heretofore referred to. Morris must be held to have had knowledge of the law, as well as of the by-law and resolution prohibiting excess loans to any person. He was in the active management of the affairs of the bank. It was his duty to comply with the by-law and resolution of the bank and to see that no loan was made to any person in violation of the same or in violation of the statute. If he had faithfully performed his duties as cashier, he would have refused to make the loans in violation of the by-law, resolution and statute. He did not do that which his duty required him to do. He did not faithfully perform his duty. He breached his bond. The fact that he believed McCray was solvent and that he did not have any intention or purpose to wrong or defraud the bank is of no avail. He did that which he was forbidden to do. The court did not err in either the first or fourth conclusion of law.

Appellant next contends the court erred in the third conclusion of law, which is that all of the conditions of the bond numbered from one to 12 are void. Appellant concedes that the trial court was bound by the opinion of the Supreme Court in *United*

*States Fidelity, etc., Co.* v. *Poetker, supra,* where it was held that a bond of the cashier of a bank was an official bond and that the limitations and conditions therein were void. An effort has been made to convince us that the Supreme Court erred in the Poetker case, and to induce us to transfer this cause to the Supreme Court with our recommendation that the Poetker case be overruled. Without entering into a discussion of this contention, it suffices to say we have not been convinced that the Supreme Court erred in that case. And, on authority of the Poetker case, we hold the court did not err in the third conclusion of law. That case was decided in 1913. The bond involved in the instant case was not executed until 1917. It would, therefore, seem that when appellant signed the bond of Morris, it did so with knowledge of the construction the Supreme Court had placed on a similar bond.

For a discussion of the questions here involved, see *National Surety Co.* v. *State, ex rel.* (1928), 90 Ind. App. 205, 161 N. E. 573.

Judgment affirmed.

Dausman, J., absent.